IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 7, 2023

## STATE OF TENNESSEE v. GUILLERMO ZAPATA

**Appeal from the Criminal Court for Shelby County**
No. 12-04926        Paula L. Skahan, Judge
_____

### No. W2023-00111-CCA-R3-CD
_____

The Defendant, Guillermo Zapata, was convicted in the Shelby County Criminal Court of two counts of aggravated sexual battery, a Class B felony. After a sentencing hearing, the trial court merged the convictions and sentenced him to seven years, two months, and twelve days in confinement. On appeal, the Defendant contends that the evidence is insufficient to support the convictions, that the trial court erred by denying his motion to dismiss the indictment based on due process and speedy trial grounds, and that the trial court erred by instructing the jury on flight. Based upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P. J., and JILL BARTEE AYERS, J., joined.

James M. Gulley (on appeal and at trial), Memphis, Tennessee, for the appellant, Guilleramo Zapata.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Steve Mulroy, District Attorney General; and Lessie Rainey, Regina Lucreziano, Jeff Jones, and Danielle McCollum, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

In September 2012, the Shelby County Grand Jury returned a two-count indictment, charging the Defendant with rape of a child, a Class A felony, in count one and the alternative theory of aggravated sexual battery when the victim was less than thirteen years

old, a Class B felony, in count two. The indictment alleged that the offenses occurred between May 1, 2010, and July 15, 2010. The Defendant was arrested in August 2018 and in October 2018, filed a motion to dismiss the indictment based on due process and speedy trial grounds. The trial court denied the motion on June 2, 2020, and the Defendant proceeded to trial on November 1, 2022.

At trial, the victim's mother [EE]. testified that she had four children: her oldest daughter, the victim, who was nineteen years old; two sons, who were seventeen and fifteen years old; and another daughter, who was six years old.[1] The Defendant was the brother of the victim's father, the brother-in-law of EE, and was the victim's uncle. The victim's mother said that she had known the Defendant about sixteen years and that his nickname was "Memo."

E.E. testified that in 2007 and 2008, her family, which at that time included her husband and three oldest children, was living in an apartment in Hickory Hill. The Defendant lived with them. About a year later, E.E.'s family moved into a house on Hopewell Road. E.E.'s sons slept in one bedroom, the victim slept in another bedroom, and E.E. and her husband slept in the third bedroom. The Defendant did not live with them on Hopewell Road but would spend the night at their house sometimes so he could go to work with E.E.'s husband the next day.

E.E. testified that in January 2011, she walked into the victim's bedroom unannounced and saw the victim, who was seven years old, "touching herself." The victim was clothed and "moved her hand like she was scared." E.E. was worried and asked the victim if anyone had touched her. The victim nodded yes. E.E. "asked who," but the victim would not answer and "stayed frozen." E.E. began naming men, "trying to get it out of her." E.E. first named her father, the victim's grandfather. She then named her husband, the victim's father. She also named two of the victim's uncles. Each time, the victim said no. E.E. finally asked the victim, "Memo?" The victim started crying and said yes. E.E. hugged the victim and told the victim that she was "sorry this happened."

E.E. testified that she felt angry and betrayed by the Defendant and that she telephoned the police. She also telephoned her husband and told him what the Defendant had done to the victim. The police were supposed to come to E.E.'s house. E.E. wanted the Defendant to be there so the police could arrest him, so she telephoned the Defendant and tried to trick him into coming to her home by inviting him to a cookout. The Defendant said he would come but never showed up. E.E. did not see him again until 2017 or 2018 when she unexpectedly saw him at a restaurant, Incredible Pizza. She said that prior to the victim's allegations, she usually saw the Defendant every week.

---

[1] In order to protect the victim's identity, we will refer to some of the witnesses by their initials.

E.E. testified that the police arrived at her home and that she told them what had happened to the victim. She stated, "And I had probably better details back then because I remembered everything at the time." E.E. later took the victim to the Child Advocacy Center ("CAC") for a forensic interview, and the victim received counseling for about a year. E.E. said the victim used to "get along great" with the Defendant. E.E. recalled, though, that she noticed the victim's behavior toward the Defendant changed at some point. She explained that the victim would become "upset" when the Defendant came to their house. The victim also did not want to hug the Defendant, which bothered E.E. because she thought the victim was being disrespectful to him. E.E. said she noticed the change in the victim's behavior during the summer of 2010. The victim told E.E. that she had revealed the abuse to a friend who came over to play with the victim. E.E. recalled that the victim's friend came over to play in the summer of 2010.

On cross-examination, E.E. acknowledged that by "touching herself," she meant the victim was masturbating. E.E. said that she "didn't know if [the victim] was just trying to explore or something had happened" and that she "wanted to get to the bottom of it." E.E. began naming males who had been in close contact with her children, and her conversation with the victim lasted ten to fifteen minutes.

Defense counsel questioned E.E. about an incident between her husband and her sister. E.E. explained that one time when she and her husband were dating, he put his arm around her and was touching her sister's breast instead of E.E.'s breast. E.E. described the incident as a "misunderstanding." She said she did not remember if she told the police that the incident between the Defendant and the victim occurred in the summer of 2010, and she acknowledged that the incident could have happened at a different time. However, she then said that she was sure the incident happened in the summer of 2010 because the victim disclosed the abuse to a neighborhood friend. The victim's friend came over to play in the summer of 2010.

E.E. testified that she did not remember if she gave a written statement to the police or if she told the police that the Defendant pulled down the victim's pants. She also did not remember if she gave a statement at the CAC or if the victim received a medical examination. E.E. said she did not think she told the police about seeing a change in the victim's demeanor. E.E. and the Defendant had a good relationship prior to the victim's allegations. E.E. never suspected him of abusing the victim, and he was the last man E.E. named to the victim.

The victim testified that she was a nursing student at the University of Memphis and that she "used to call [the Defendant] Memo." When the victim was seven years old, her family lived in a three-bedroom house on Hopewell Road in East Memphis. The victim slept in one bedroom, her two brothers slept in another bedroom, and her parents slept in

the third bedroom. However, the children liked sleeping with their mother, and each sibling would take turns sleeping with her. The Defendant did not live with them but "slept over at times."

The victim testified that one night when the Defendant spent the night, she was asleep in her bed with one of her brothers while her other brother was sleeping with their mother. The Defendant was sleeping on the couch. The victim said the Defendant carried her from her bedroom to her brothers' bedroom, laid her on her brothers' bed, and "started to touch me down there" with his fingers. She said that she kept her eyes closed because she did not know what was happening and that the Defendant touched her "on [her] vagina." The victim was wearing underwear when she went to bed, but the victim realized during the incident that her underwear was off. The State asked if the Defendant touched the inside or the outside of her vagina, and the victim said he touched between the "lips" of her vagina but not inside her "hole." The Defendant did not say anything to the victim, and the victim pretended to be asleep because she was scared. The victim continued to keep her eyes closed but "kind of peeked up a little bit at times when he was looking down there." The victim said she did not remember how long the touching lasted but that "[i]t seemed like forever because I wanted to just go back to my room and go to sleep." At some point, the Defendant stopped and left the room, and the victim returned to her bedroom.

The victim testified that she "knew it was wrong" but that she did not tell anyone immediately because she "didn't know what to do." The victim later told a neighborhood friend who was her age but did not tell anyone else. In January 2011, when the victim was still seven years old, her mother walked into her bedroom and saw her touching herself. The victim said that she "jumped" and covered herself with a blanket and that she was scared and thought she had done something "bad." The victim told the jury that she "just touched myself down there to see what he was doing" and that her mother "immediately knew" she had been abused. The victim said that her mother asked who touched her and that her mother "would name all these people." The victim's mother first named the victim's grandfather, then one of the victim's uncles, and then another uncle. Finally, the victim's mother named "Memo," and the victim nodded her head yes. The victim stated, "I kept saying no until she guessed the right one."

The victim testified that prior to the abuse, she loved the Defendant and considered him one of her protectors. After the abuse, the victim hated the Defendant and would push him away when he tried to hug her. When the victim revealed the abuse to her mother, the victim was "kind of confused, but relieved at the same time." She said that she did not remember what she told her mother and that she did not remember if she talked to the police. However, the victim remembered talking to a woman at the CAC. The victim's CAC interview was video-recorded, and the victim reviewed the recording before trial.

She said that everything she said in her interview was true. Prior to revealing the abuse, the victim saw the Defendant "very often." After her allegations, she did not see him again until she saw him at Incredible Pizza in 2017.

On cross-examination, the victim acknowledged that when her mother discovered her touching herself, their conversation "went straight to abuse." The victim did not remember how long their conversation lasted, and they did not discuss the victim's touching herself. The victim stated, "All I can remember is she was just asking me, like, who it was, and she didn't stop until I told her who actually did it." The victim did not want to answer her mother but told her mother when her mother "got the name right." The victim said that she did not remember their "exact conversation" but that she told her mother the Defendant "touched me down there." The victim did not tell her interviewer at the CAC that the abuse happened in the summer. The victim explained that she "just answered the questions" the interviewer asked her.

R.E., the victim's father and the Defendant's older brother, testified that one day in January 2011, he received a telephone call from his wife as he was returning home from work. In response to the call, R.E. telephoned another brother and asked if he knew of any abuse to the brother's children. R.E. did not telephone the Defendant. R.E. said that prior to that day, he saw the Defendant about once a week. The Defendant also spent the night at R.E.'s home sometimes because they worked together and would go to work together the next morning. After the victim's allegations, R.E. did not see the Defendant until a few years later when he and his family "[ran] into" the Defendant at Incredible Pizza.

On cross-examination, R.E. testified that he did not speak with the Defendant at Incredible Pizza. The Defendant was at the restaurant with R.E.'s other brother and the brother's family. R.E. denied being accused of touching E.E.'s sister inappropriately.

Sergeant Kim Hoard of the Memphis Police Department ("MPD") testified that in 2011, she worked in the Child Abuse Unit and was responsible for investigating allegations of child sexual and physical abuse.[2] The victim's case was assigned to her and "was stamped DCS handle and return." Someone at DCS, the Department of Children's Services, scheduled the victim for a forensic interview at the CAC. The victim's completed interview was "transcribed to a summary," and Sergeant Hoard reviewed the summary. Because the alleged abuse was more than seventy-two-hours old, a rape kit was not collected from the victim. Sergeant Hoard did not go to the crime scene and did not interview any witnesses. She tried to contact the Defendant by telephone, but his telephone number had been disconnected.

---

[2] At the time of trial, Sergeant Hoard was retired from the MPD. However, we will refer to witnesses by the title in effect at the time of their involvement in this case.

On cross-examination, Sergeant Hoard acknowledged that after the victim's mother called the police, a police officer went to the victim's home and spoke with the victim's mother. Sergeant Hoard did not know if the officer spoke with the victim. According to the initial report, the victim's pants and panties were "pulled down." The Defendant did not live with the victim's family on Hopewell Road but would spend the night at their house sometimes so he could go to work with E.E.'s husband the next day. The victim had provided a timeframe for the abuse, but Sergeant Hoard did not remember the timeframe. On redirect examination, Sergeant Hoard testified that the victim reported digital penetration; therefore, no DNA evidence would have been available.

Letitia Cole testified that she was a forensic interviewer at the CAC in Memphis. She described a forensic interview as "a child-friendly, a neutral conversation between myself and the child" and said that her job was to listen to the child, not determine whether the child was telling the truth. Ms. Cole conducted the victim's forensic interview on February 24, 2011. The victim gave age-appropriate responses about a child's physical development, and her interview was video-recorded.

The State played the video for the jury, and we have reviewed the victim's forensic interview. The victim told Ms. Cole that she lived with her parents and two brothers, who were six and three years old. Ms. Cole showed the victim drawings of a girl and a boy, and the victim referred to the breasts on both of the drawings as "nipples" and the genitals on both of the drawings as "private part." The victim told Ms. Cole that her Uncle Memo touched her "private part" with his finger and that the incident occurred "about a year ago." The victim said that she was sleeping with one of her brothers in her bed; that the Defendant carried her to her brother's bed in another bedroom; that he took off her pants and panties; and that he began touching her. The victim was awake but pretended to be asleep. She kept her eyes closed but opened them "a little" and saw the Defendant. Ms. Cole asked where the Defendant touched her on her private part, and the victim said, "On the inside, kind of." The victim said the touching felt "weird" because her mother did not allow anyone to touch her. The victim did not tell her mother about the abuse immediately because she was afraid her mother would be mad at her. The victim's mother later asked her questions, so the victim told her mother about the abuse.

After Ms. Cole's testimony, the State read two stipulations of fact to the jury. The first stipulation provided that if called to testify, experts in the field of child psychology and pediatric medicine would say that masturbation by a seven-year-old female child was normal behavior and that masturbation by a seven-year-old female child alone did not indicate an increased or decreased likelihood that the child was a victim of sexual abuse. The second stipulation provided that the Defendant was indicted for the crimes on September 13, 2012, and that a warrant was issued for his arrest on September 18, 2012.

- 6 -

The State rested its case, and the Defendant did not present any proof. As to count one, the jury convicted him of aggravated sexual battery when the victim is less than thirteen years old as a lesser-included offense of rape of a child. Regarding count two, the jury convicted him as charged in the indictment of aggravated sexual battery when the victim is less than thirteen years old. The trial court held a sentencing hearing, merged the convictions, and sentenced the Defendant to seven years, two months, and twelve days in confinement.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that although the victim testified about conduct that would constitute aggravated sexual battery, the evidence nevertheless is insufficient to support the convictions because "there was no corroboration." He also contends that the evidence is insufficient because the victim and other witnesses could not remember details about the case, indicating the witnesses were not credible. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the

conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

Relevant to this case, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant" and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

As to the Defendant's claim that the evidence is insufficient because there was no corroboration, the Defendant does not explain what testimony or evidence needed to be corroborated. We note that a felony conviction in Tennessee may not rest solely upon the uncorroborated testimony of an accomplice. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). Previously, Tennessee courts held that a minor victim of sexual abuse could, in certain circumstances, qualify as an accomplice to the crime, meaning that the child's testimony had to be corroborated. *See State v. Collier*, 411 S.W.3d 886, 895-96 (Tenn. 2013) (citing cases as examples). However, in *Collier*, our supreme court expressly overruled all prior decisions requiring the testimony of a minor victim of a sex offense be corroborated. 411 S.W.3d at 899. Moreover, our supreme court has found that a child victim's testimony about sexual abuse is sufficient to support a defendant's convictions. *See State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003). That said, E.E. did offer some corroboration of the victim's testimony when E.E. testified that the Defendant would spend the night at her house sometimes; that the victim's behavior toward the Defendant changed in the summer of 2010; and that a particular friend of the victim, to whom the victim supposedly reported the abuse, came over to play with the victim in the summer of 2010.

As to the Defendant's claim that the victim and witnesses lacked credibility because they could not remember some facts about the case, defense counsel thoroughly cross-examined all of the witnesses and honed in on their inability to recall details about the case. Determining the credibility of witnesses is within the purview of the jury. *See State v. Millsaps*, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). Here, the victim testified that the Defendant carried her into her brothers' bedroom, removed her underwear, and touched inside the lips of her vagina with his fingers. The victim's account was essentially the same as her account in her CAC interview, and the jury obviously resolved any issues of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. *See State v. Carruthers*, 35 S.W.3d 516, 558 (Tenn. 2000). Therefore, the evidence is sufficient to support the convictions.

## II. Motion to Dismiss the Indictment

Next, the Defendant claims that the trial court erred by denying his motion to dismiss the indictment. Specifically, the Defendant raises two issues: (1) the delay between the victim's reporting the abuse until the issuance of the indictment violated his right to due process and (2) the delay between the issuance of the indictment until his arrest violated his rights to due process and speedy trial. The State argues that the trial court did not err. We agree with the State.

On October 30, 2018, the Defendant filed a motion to dismiss the indictment. In the motion, the Defendant claimed that the alleged abuse was reported to Memphis police on January 29, 2011; that he was indicted on September 13, 2012; that a capias was issued for his arrest on September 18, 2012; and that he did not learn about the indictment until an "ordinary" traffic stop on August 11, 2018. First, the Defendant asserted that the nineteen-month delay from the date the abuse was reported to law enforcement until the date of the indictment violated his right to due process because the State intentionally delayed the indictment to gain a tactical advantage or "due to bureaucratic indifference." Second, he asserted that the nearly six-year delay from the date of the indictment until he was served with the capias or learned about the indictment violated his rights to due process and speedy trial. He claimed he was "severely prejudiced" by the post-indictment delay because the memories of witnesses had faded, witnesses had become unavailable, and evidence had been lost. The State responded to the motion, arguing that the Defendant was not entitled to relief for the preindictment delay because he did not allege actual prejudice and because the State did not cause the delay to gain a tactical advantage. The State argued that the Defendant was not entitled to relief for the post-indictment delay because law enforcement was not able to locate him until 2018. The trial court held hearings on the motion in August, October, November, and December 2019.

During one of the hearings on August 19, 2019, Sergeant Hoard testified for the State about the process of reporting sex abuse crimes against children. She explained that reports of sexual abuse "go through a morning CPIT," which was the acronym for Child Protection Investigative Team. The team was composed of a person from the CAC, an MPD Lieutenant, a person from the Shelby County Sheriff's Office ("SCSO"), and a prosecutor. The victim's mother reported the abuse to the police on January 29, 2011. The responding officer forwarded the initial report to the CPIT, and the morning CPIT reviewed the report. Sergeant Hoard regularly attended CPIT meetings, and the case was assigned to her on January 31, 2011. A DCS employee arranged for the victim to participate in a forensic interview on February 24, 2011, and the case was returned to Sergeant Hoard on March 29, 2011.

Sergeant Hoard testified that she then talked with the victim's mother, who thought the Defendant had returned to Mexico. The Defendant's telephone number and address were in the initial report, so Sergeant Hoard tried to contact him by telephone on April 12, 2011. However, the telephone number had been disconnected. Sergeant Hoard went to the Defendant's address on April 14, 2011, but "there was no answer." On the afternoon of April 14, 2011, Sergeant Hoard turned in her report to the CPIT and recommended that the Defendant be indicted. Assistant District Attorney General Gregg Carman "signed off" on the recommendation that same day.

Sergeant Hoard testified that she talked with the victim's mother again on April 19, 2011, and that the victim's mother thought the abuse occurred "a year ago, when the suspect was staying with them." Sergeant Hoard had the victim's forensic interview transcribed, and Sergeant Hoard received the transcription on May 5, 2011. Sergeant Hoard prepared a supplement and turned in her supplement to Lieutenant Melanie Howell for approval on August 24, 2011. At that point, the case was sent to the district attorney general's office for indictment, and Sergeant Hoard had no further involvement. She said that all child sex abuse cases went through the same process and that this case went through the normal procedure in place at the time.

On cross-examination, Sergeant Hoard testified that she had no independent recollection of the case due to the passage of time and that her testimony about the case came from the initial report and her supplement, both of which she reviewed before and during the hearing. She said that she was not sure who gave the Defendant's telephone number and address to the initial responding officer but that she assumed the victim's mother provided the information.

Deputy Margaret Lewis of the SCSO testified for the State that she spent nine years working in the Fugitive Unit and serving warrants. She explained the general procedure for serving warrants on suspects as follows: The Fugitive Unit used "a law enforcement link" known as "WASP" to access a warrant.[3] The warrant contained the suspect's name, address, date of birth, and Records and Identification "RNI" number." Deputy Lewis would go to the address to look for the suspect. If the suspect was present, Deputy Lewis would arrest him or her. If someone at the address said the suspect no longer lived there, Deputy Lewis would note in WASP that the suspect no longer lived at the address. Deputy Lewis was not allowed to enter a residence without consent. If Deputy Lewis was unable to serve the warrant, the warrant remained in the WASP system, other officers could see the notes for the warrant, and officers could try to serve the warrant again. However, upon serving the warrant, the notes for the warrant were automatically deleted from WASP.

---

[3] WASP is the acronym for Warrant Apprehension Solution Program. *See State v. Reinsberg*, No. W2014-02436-CCA-R3-CD, 2016 WL 4009666, at *5 (Tenn. Crim. App. July 22, 2016).

Deputy Lewis testified that she was not involved in arresting the Defendant but that she reviewed his warrant. No notes about the warrant were present in WASP because the notes were automatically deleted at the time of his arrest.

On cross-examination, Deputy Lewis acknowledged that she did not have any specific knowledge about this case but that the Defendant's warrant also would have been in the national crime database, NCIC. Therefore, officers in other jurisdictions would have been able to access his warrant.

Defense counsel recalled Sergeant Hoard back to the stand. Sergeant Hoard testified that according to the initial report, the abuse occurred between June 24, 2010, and January 28, 2011. She acknowledged that the indictment alleged the abuse occurred between May 1, 2010, and July 15, 2010. She did not know why the dates in the indictment differed from the dates in the initial report.

During a hearing on October 10, 2019, Gregg Carman, a supervisor for the Shelby County Public Defender's Office, testified for the Defendant that he was a prosecutor for the Shelby County District Attorney's Office in April 2011. On April 14, 2011, General Carman participated in a weekly CPIT meeting. A second prosecutor also may have been present. During the meeting, General Carman reviewed a document that recommended the Defendant be indicted for rape of a child. General Carman said that he "signed off" on the document and that "we made the decision to go ahead and indict this case."

General Carman acknowledged that there were two ways to initiate a criminal case: indict a defendant or arrest a defendant. Defense counsel asked General Carman to explain "what factors come into play in your making a decision as to whether to seek an indictment [versus] seek a warrant for a suspect's arrest[.]" General Carman stated that the decision was made "on a case by case basis" and was based on "a number of factors." Those factors included whether the child reported the abuse immediately, whether an independent witness saw the abuse, the age of the child, the potential for additional abuse of the child or another child, and whether the child "would be able to testify well at a preliminary hearing or not." He acknowledged that a witness who testified poorly at a preliminary hearing could damage the State's case.

General Carman testified that he did not remember this case specifically and that he did not remember why he recommended the case for indictment rather than arrest. He said that obtaining an indictment was typically a slower process and that "it could take maybe a month or two" after a prosecutor signed the recommendation for an indictment before the grand jury could hear the case. Defense counsel asked if eighteen months from the date the abuse was reported until the case was indicted was "unusual." General Carman responded:

No. Again, a lot of factors go into that[:] when the case was actually reported, when the case may actually come up at CPIT meetings[,] is their reason it was delayed in CPIT to obtain more information or to get a forensic interview or to learn about potentially other victims.

There's a number of variables that would be involved, but I could see a case that might be reported. Let's give an example, January 1st might go in front of CPIT, you know, in three or four months and then might be indicted in two months, but it might take a year to be indicted. Again, it would, I guess, depend on the individual that's doing the indictment paperwork and how quick the State report was given to the prosecutor.

He acknowledged that the district attorney's office had a "role" in how long it took to indict a defendant. General Carman left the district attorney's office soon after he signed the recommendation to indict the Defendant on April 14, 2011, and he did not know why the Defendant was not indicted until September 2012. On cross-examination, General Carman testified that he would not have recommended the case for indictment if he had thought he could not show probable cause at the Defendant's preliminary hearing.

During a hearing on November 22, 2019, Ms. Cole testified for the State that she was trained to conduct forensic interviews with children and that she interviewed the seven-year-old victim at the CAC. The victim was "calm," answered all of Ms. Cole's questions, and "seemed like a normal seven year old." Ms. Cole asked the victim open-ended questions so as not to suggest answers from her. The victim led the interview and told Ms. Cole that the Defendant abused her "about a year ago."

On cross-examination, Ms. Cole testified that she did not remember the victim's interview but that she reviewed a recording of the interview for the hearing. She described herself as "a neutral party" and said that she knew "just a little bit" about a case prior to an interview, which helped her remain neutral. She stated that she was "just there to hear what the child has to say" and that she did not confront the child about inconsistencies or try to determine whether the child was telling the truth.

At the November 2019 hearing, the victim testified that she was sixteen years old and that she was in the eleventh grade. She reviewed her recorded CAC interview prior to the hearing and identified the recording for the trial court. She said that she did not remember participating in the interview but that she remembered attending counseling. The victim thought she attended counseling close in time to the abuse and thought she attended counseling after her CAC interview. The victim stated that she "clearly" remembered the Defendant's sexually abusing her and that she told the truth in her

interview. The victim told Ms. Cole that the abuse occurred "about a year" before the interview. The State played the victim's video-recorded interview for the trial court.

On cross-examination, the victim testified that she told her mother about the abuse after her mother walked into her bedroom unannounced and that she told her mother because she thought she was in trouble. The victim said that she did not remember what season of the year the abuse occurred, that she did not know why she told Ms. Cole the abuse occurred about a year before her CAC interview, and that she did not know why the indictment alleged the abuse occurred between May 1 and July 15, 2010.

During the final hearing on December 6, 2019, E.E. testified that after the victim revealed the abuse to her, she telephoned the police and her husband. She then telephoned the Defendant and tried to trick him into coming to her house by inviting him to a cookout. E.E. pretended not to know anything about the victim's allegations so the Defendant would be at her house when the police arrived. However, the Defendant never showed up. Later that day or the next day, E.E. spoke with the Defendant again on the telephone. She was angry with him because he knew she had called the police but would not tell her where he was located. E.E. said that prior to the victim's allegations, E.E. saw the Defendant on a regular basis. After the victim's allegations, E.E. did not see him again.

On cross-examination, E.E. testified that the victim would not say at first who abused her. E.E. named E.E.'s father and brother, but the victim kept saying no. The victim finally told E.E. that it was the Defendant. E.E. acknowledged that the victim alleged the abuse after E.E. saw the victim touching herself. E.E. asked the victim if anyone had touched her, but the victim did not want to answer the question. E.E. said that the Defendant lived with her family in 2008. He never lived with the family in the house where the abuse occurred but would spend the night there sometimes because he went to work in the mornings with E.E.'s husband. E.E. thought the abuse occurred about a year before she reported it to the police, but she did not know the specific date of the abuse. She estimated when the abuse occurred based on "clues" from the victim, explaining that the victim stopped wanting to hug the Defendant and would push him away. E.E. said she did not remember if the victim told her the abuse occurred about a year before the allegations.

J.E. testified that he, the Defendant, and the victim's father were brothers. E.E. was J.E.'s sister-in-law, and the victim was J.E.'s niece. At the time of the victim's allegations, the Defendant was living with J.E. The victim's father told J.E. that the Defendant had abused the victim, so J.E. telephoned the Defendant and told him about the allegations. J.E. also told the Defendant that the police had been contacted and that the Defendant needed to leave. The Defendant stayed with the J.E. one or two more days but then "just left out." J.E. did not know where the Defendant went. J.E. later spoke with the Defendant, and the Defendant said he was living with a friend in Texas.

On cross-examination, J.E. testified that the Defendant claimed he did not do anything wrong. J.E. acknowledged that prior to the victim's allegations, the Defendant would leave Tennessee to visit friends. However, the Defendant never went to Texas to visit friends.

On June 2, 2020, the trial court entered an order denying the Defendant's motion to dismiss the indictment. Addressing the preindictment delay, the trial court found that the Defendant failed to show prejudice because no material witnesses had become unavailable and because the testimony of the witnesses at the hearings showed their memories "had not faded prejudicially." The trial court also found that even if the Defendant was prejudiced by the preindictment delay, "[t]estimony during the evidentiary hearings by Kim Hoard, Gregg Carman, and Letitia Cole tended to prove that the delay was caused by standard agency procedure, and not an intentional desire to gain a tactical advantage." Addressing the post-indictment delay, the trial court found that the length of the delay triggered speedy trial analysis, that the delay occurred because the Defendant went to Texas, that the Defendant did not assert his right to speedy trial during the delay, and that the Defendant failed to show prejudice.

## A. Preindictment Delay

We review a trial court's ruling on a motion to dismiss the indictment for an abuse of discretion. *State v. Harris*, 33 S.W.3d 767, 769-70 (Tenn. 2000). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is illogical or unreasonable and causes an injustice to the party complaining." *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (internal quotation and citation omitted).

In *United States v. Marion*, 404 U.S. 307, 324 (1971), the United States Supreme Court stated that

> [t]he Due Process Clause of the Fifth Amendment would require dismissal
> of the indictment if it were shown at trial that the pre-indictment delay . . .
> caused substantial prejudice to [the defendant's] rights to a fair trial and that
> the delay was an intentional device to gain tactical advantage over the
> accused.

To establish a Fifth Amendment due process violation stemming from a preindictment delay, the defendant must prove the following prerequisites, also known as the *Marion-Dykes* test: (1) there was a delay; (2) the accused sustained actual prejudice as a direct and proximate result of the delay; and (3) the State caused the delay in order to gain a tactical advantage over the accused or to harass the accused. *State v. Utley*, 956 S.W.2d 489, 495

(Tenn. 1997) (citing *Marion*, 404 U.S. at 324-25, and *State v. Gray*, 917 S.W.2d 668, 671 (Tenn. 1996)); *see also State v. Carico*, 968 S.W.2d 280, 284-85 (Tenn. 1998).

Here, there was a delay of more than nineteen months between the date of the victim's allegations and the date of the indictment. The Defendant claims that the delay caused "serious prejudice" to the defense because the memories of "key" witnesses, such as E.E., Sergeant Hoard, and Ms. Cole, had faded; he points to various examples of those witnesses not being able to remember details about the case at the hearings on the motion to dismiss and at trial. He also claims that the State caused the delay to gain a tactical advantage and points to General Carman's testimony that avoiding a preliminary hearing was part of the decision to seek an indictment. In the alternative, he claims that the delay was due to bureaucratic indifference.

The victim testified that she clearly remembered the details of the abuse. While some of the witnesses testified that they could not recall certain facts about the case, defense counsel thoroughly questioned them about their recollections and observations. As to the State's tactical advantage, Sergeant Hoard testified that the case went through the normal procedure that was in place at the time, and General Carman testified that the length of time between the victim's allegations and the indictment was not unusual. Therefore, the record supports the trial court's conclusion that the Defendant was not entitled to relief on Fifth Amendment due process grounds.

## B. Post-Indictment Delay

The right to a speedy trial, which is guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 9 of the Tennessee Constitution, "attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." *State v. Vickers*, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997). In determining whether a defendant's constitutional right to a speedy trial has been violated, this court must conduct the balancing test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). *See State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996); *State v. Baker*, 614 S.W.2d 352, 353 (Tenn. 1981). Under the *Barker* analysis, the following four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. 407 U.S. at 530. The most important consideration is the prejudice factor. *State v. Simmons*, 54 S.W.3d 755, 760 (Tenn. 2001). Our review of a speedy trial claim is "de novo with respect to whether the court correctly interpreted and applied the law." *State v. Moon*, 644 S.W.3d 72, 78 (Tenn. 2022), *cert. denied* 143 S. Ct. 254 (2022). This court gives "deference to the trial court's findings of fact unless the evidence preponderates otherwise." *Id*.

- 15 -

In this case, the Defendant was indicted in September 2012 but not arrested until August 2018, a delay of almost six years. A delay of one year or longer will usually trigger an inquiry into a speedy trial violation. *Vickers*, 985 S.W.2d at 5. Generally, the reason for the delay falls into one of four categories:

> (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense.

*Wood*, 924 S.W.2d at 346-47 (footnotes omitted). A delay caused by the defendant is weighed against the defendant. *Id*. During the hearings on the motion to dismiss, the State presented evidence that the delay occurred because the Defendant fled to Texas when he learned about the victim's allegations and that law enforcement could not locate him for arrest. The trial court found that the Defendant fled, and the evidence does not preponderate against the finding of the trial court. Thus, the reason for the six-year delay weighs heavily against the Defendant.

The Defendant's capias, or warrant, went unserved, and he claims he did not know about the indictment until an ordinary traffic stop on August 11, 2018. "[A]n accused who is unaware of pending charges because the indictment has been sealed or not served cannot be penalized for failure to assert the speedy trial right." *Simmons*, 54 S.W.3d at 760. After the Defendant's arrest, he filed his motion alleging a speedy trial violation just two months later on October 31, 2018. Thus, the third factor weighs in his favor.

Prejudice, the final factor, is to be assessed in light of the following interests of the accused, which the right to a speedy trial was designed to protect: (1) to prevent undue and oppressive incarceration prior to trial; (2) to minimize the anxiety and concern that results from being accused of a crime; and (3) to limit the risk that the defense will be impaired. *Id*. at 760. Our supreme court has stated that "the most important issue concerning prejudice to the defendant is the impairment of the ability to prepare a defense." *State v. Berry*, 141 S.W.3d 549, 568 (Tenn. 2004) (citing *State v. Baker*, 614 S.W.2d 352, 356 (Tenn. 1981)). The Defendant was not incarcerated during the delay, and he cannot say he suffered anxiety or concern because he claims he was unaware of the charges. Regarding the impairment to his defense, the Defendant has not specified any witnesses or evidence that became unavailable during the delay. As we stated previously, the delay may have resulted in some of the witnesses being unable to recall details about the case; however, the victim testified that she clearly remembered the abuse, and the Defendant was able to cross-examine her and the other witnesses about their recollections. Thus, we conclude that the Defendant was not denied his right to a speedy trial.

- 16 -

### III. Flight Instruction

Finally, the Defendant claims that the trial court erred by instructing the jury on flight because there was no evidence of flight presented at trial. The Defendant notes that the State did not offer any evidence at trial as to his whereabouts after the victim's mother reported the abuse or that he was even aware of the victim's allegations. The State argues that the trial court properly instructed the jury because the State presented evidence from which the jury could infer the Defendant left the jurisdiction. The State contends that the victim and her parents testified that they saw the Defendant regularly prior to the victim's allegations but did not see him for years after the allegations, the Defendant's telephone had been disconnected, and there was no answer at his address. We agree with the State.

During a discussion about the final jury charge, defense counsel requested that the flight instruction be removed. The State contended that the jury could infer flight from E.E.'s testimony that she used to see the Defendant regularly, that he was supposed to attend the cookout the day the victim revealed the abuse, and that E.E. did not see him again for six years.

The trial court stated that "[t]here could've been stronger proof put on by the State" at trial for a flight instruction but found that enough proof existed to support the instruction. The record reflects that the trial court instructed the jury on flight as follows:

> Flight. The flight of a person accused of a crime is a circumstance which when considered with all the facts of the case may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.
>
> The law makes no precise distinction as to the manner or method of flight. It may be open or it may be a hurried or concealed departure or it may be a concealment [within] the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community or a leaving of the community for parts unknown to constitute flight.
>
> If flight is proved, the fact of flight alone does not allow you to find the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant.

- 17 -

On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances of the case. Whether there was flight by the defendant, the reasons for it, and the weight to be given to it are questions for you to determine.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." *State v. Smith*, 492 S.W.3d 224, 245 (Tenn. 2016).

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *Berry*, 141 S.W.3d at 588. There is sufficient evidence to support a jury charge on flight where there is proof of "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown.'" *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998) (emphasis omitted) (quoting *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action. *See State v. Wilks*, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999). This court has explained that:

> The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

*State v. Whittenmeir*, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986) (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)). "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).

We agree with the trial court that the evidence was sufficient to support a flight instruction. The proof at trial showed that prior to the victim's allegations, the victim and

her family saw the Defendant regularly and that he sometimes spent the night at the victim's home because he worked with the victim's father. After the allegations surfaced, though, the victim's family no longer saw the Defendant. E.E. testified that after the victim told her about the abuse, she spoke with the Defendant and tried to lure him to her home for a cookout so the police could arrest him. Although the Defendant said he would come to the cookout, he never showed up, and the victim's family did not see him again until many years later when the family unexpectedly saw him at Incredible Pizza. The victim's father testified that after E.E. told him about the abuse, he contacted another brother and asked if the brother knew of any abuse to the brother's children. Sergeant Hoard testified that she tried to contact the Defendant by telephone but that his telephone number had been disconnected. From this evidence, the jury could infer that the Defendant learned about the allegations; that he left the scene of the difficulty; and that he subsequently hid out, evaded, or concealed himself within or outside the community. Therefore, the trial court did not err by instructing the jury on flight.

## CONCLUSION

Upon our review, we affirm the judgments of the trial court.


_____
JOHN W. CAMPBELL, SR., JUDGE

- 19 -